# Illinois Official Reports

## Appellate Court

*People v. Nunn*, **2014 IL App (3d) 120614**

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MICHALA R. NUNN, Defendant-Appellant. |
| District & No. | Third District<br>Docket No. 3-12-0614 |
| Filed<br>Rehearing denied | October 31, 2014<br>December 22, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's convictions for aggravated battery and resisting arrest arising from an incident in which she began kicking police officers who were responding to a verbal altercation at a convenience store between defendant and her ex-boyfriend and his girlfriend were vacated where the trial court erred in denying defendant's motion to dismiss based on her claim that she was denied due process when the police ordered the onlookers to stop using their cell phones to record the incident and to delete any recordings, since the officers demonstrated bad faith when they failed to take any action to preserve the recordings and thereby deprived defendant of her due process right to "potentially useful evidence." |
| Decision Under Review | Appeal from the Circuit Court of Knox County, No. 11-CF-204; the Hon. Paul L. Mangieri, Judge, presiding. |
| Judgment | Reversed and vacated. |

Counsel on Appeal

Kerry J. Bryson (argued), of State Appellate Defender's Office, of Ottawa, for appellant.

John T. Pepmeyer, State's Attorney, of Galesburg (Richard T. Leonard (argued), of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Panel

JUSTICE O'BRIEN delivered the judgment of the court, with opinion.
Justice McDade concurred in the judgment and opinion.
Justice Schmidt dissented, with opinion.

**OPINION**

¶ 1    Defendant Michala Nunn was convicted by a jury of aggravated battery of a peace officer and resisting arrest and sentenced on the battery charge to 2 years' probation and 14 days in the county jail. She appealed her conviction, arguing that she was denied a fair trial before an impartial jury and was denied due process when the police ordered the destruction of cell phone videos recording her arrest. We reverse and remand.

¶ 2                                 FACTS

¶ 3    In April 2012, defendant Michala Nunn was charged with four counts of aggravated battery (720 ILCS 5/12-4(b)(18) (West 2010) (renumbered 720 ILCS 5/12-3.05(d)(4) (West 2012) (eff. July 1, 2011)) and two counts of resisting arrest (720 ILCS 5/31-1(a-7) (West 2010)). The charges stemmed from an incident at the Quick Sam's convenience store in Galesburg that took place in May 2011. Police were called to the store to respond to a verbal altercation between Nunn, her ex-boyfriend and his girlfriend. Nunn was allegedly uncooperative with the officers and proceeded to kick at them. An officer arrested Nunn, handcuffed her and threw her to the ground, knocking out her two front teeth. Nunn spit blood, allegedly at the officers, and was eventually transported to the hospital by paramedics, where she was treated for her injuries.

¶ 4    Jury summonses were issued and *voir dire* commenced. The State presented the venire panels with three hypotheticals. The first hypothetical concerned speeding and the jury's ability to follow the law even if the jurors disagreed with it. The second hypothetical concerned the State's burden to prove the defendant guilty beyond a reasonable doubt and involved scenarios where jurors would have to weigh evidence and assess witness credibility. The third hypothetical involved a wedding scenario and the jury's responsibility to sort through differing evidence. The State presented the hypotheticals to each panel of venirepersons and alternates. Nunn objected at one point but the trial court overruled the objection.

¶ 5    A jury was empanelled, along with two alternate jurors. A trial took place. Several Galesburg police officers who were at the arrest scene testified for the State, including Kyle Winbigler, Lee McCone, and Charles Bush. Allison Buccalo, a police dispatcher who was on a ride-along, also testified for the State. Winbigler, the arresting officer, noticed witnesses

recording the police interaction with Nunn on their cell phones and saw other officers try to take the phones. When the witnesses refused to turn over their phones, the officers told them to delete any recordings. Winbigler believed the police had authority to seize the phones but there was insufficient manpower on the scene to do so. McCone estimated there were "several" people at the scene but he did not see anyone recording or officers asking the crowd to delete any recordings. McCone stated it was okay for people to tape in public but he was unsure whether the officers could lawfully seize the phones. McCone also admitted that he "put" Nunn to the ground to restrain her.

¶ 6    Bush assisted in crowd control at the scene and saw McCone "take" Nunn to the ground. He estimated 100 to 200 people were watching Nunn's arrest and some people were recording the encounter. The crowd was gathered 20 to 30 feet from the arrest area. He told the witnesses who were recording to delete the video or turn the phones over as evidence. Although he had the authority to seize the phones, no one volunteered to turn his or her phone over to him. He believed the witnesses had the right to record in public and that the recordings would have captured the events and been material to Nunn's guilt. Bush was unable to obtain any contact information from the recording witnesses because he was trying to maintain order, which was his primary focus. He was more concerned with maintaining order than identifying witnesses. He could have made an attempt to identify people at a later time. There were five or six other officers present. Buccalo described the crowd as large and said it turned unruly, although some people were telling Nunn to "stop resisting."

¶ 7    The State presented the rest of its witnesses and rested. Nunn moved to dismiss on the basis of the State's destruction of the cell phone evidence, which she argued denied her due process. The trial court took the motion under advisement, determining that it would rule at the end of the proceeding. Nunn also moved for a directed verdict, which the trial court denied. Nunn offered several witnesses, including Jacqueline Tate, Stephanie Ann Corbin, Kailyn Hogue, Candis Morrison, ShaVona Haymon, and David Taylor, who described that she was cooperative with the police and was thrown to the ground without apparent reason.

¶ 8    Tate testified she saw people were recording the arrest and heard police tell the witnesses to put their phones down or go to jail. Tate tried to record the arrest but the police told her that they would take her to jail if she did not put her phone away. She was able to record three officers standing around Nunn, who was on the ground with one officer's knee in her back. Tate did not offer her recording to the police. At the time of trial, Tate's phone was broken but she thought someone could "probably" get the video off of it.

¶ 9    Corbin testified that she saw Nunn slammed to the ground after barely moving her uncuffed arm. Corbin described that about 25 people were in the crowd and some of them were recording with their phones. She saw Tate's phone "snatched" by an officer, who told Tate, "You can't have that. You can't record. That's illegal." She also heard the officers threaten the recording witnesses that they could go to jail. Hogue, Morrison, and Haymon similarly testified that the police told witnesses who were recording that they had to delete the recordings, leave the scene, or go to jail. Haymon was also told the police would tow her car and arrest her for obstructing justice. Taylor, who was recording the arrest, said that an officer told him he could not record, took his phone, and deleted the recording. He later took still photographs but no longer owned the phone and did not have access to the photos. Both Tate and Taylor called 911 during Nunn's arrest.

¶ 10 Following the State's rebuttal witness, Nunn renewed her motion for a directed verdict, which the trial court again denied. The jury returned guilty verdicts on the charge of aggravated battery against McCone and of resisting McCone. Nunn was found not guilty on the other charges. The cause proceeded to a hearing on Nunn's motion to dismiss and for sentencing. The trial court found that the police did not act in bad faith in destroying and failing to preserve the cell phone recordings, and denied Nunn's motion. The trial court sentenced Nunn to a 2-year term of probation and 14 days in the county jail with credit for 4 days already served, and the remaining 10 days stayed until June 2014. She appealed.

¶ 11                                    ANALYSIS

¶ 12 On appeal, Nunn argues that she was denied a fair trial and due process. She challenges the State's *voir dire* of potential jurors as improper indoctrination. She also argues that her due process rights were violated when the police destroyed the cell phone recordings.

¶ 13 The first issue we address is whether the trial court erred when it denied Nunn's motion to dismiss for improper destruction of evidence. Nunn challenges the trial court's denial of her motion to dismiss based on the State's destruction of, and failure to collect and preserve, the cell phone videos witnesses took at the scene. She maintains that the officers at the scene acted in bad faith and their improper acts deprived her of the opportunity to obtain potentially exculpatory evidence, violating her due process rights. She further challenges her trial counsel's failure to offer a missing evidence instruction, which she argues affected the outcome of the case.

¶ 14 The State contends that Nunn has forfeited this issue. We find she did not. During the trial, Nunn filed a motion to dismiss based on the failure of the police to collect and preserve the cell phone recordings, arguing a due process violation. The trial court reserved ruling and the motion was argued postverdict and immediately prior to sentencing. Nunn did not raise the issue in a posttrial motion. Under this procedural posture, the constitutional-issue exception to the forfeiture rule applies. *People v. Enoch*, 122 Ill. 2d 176, 190 (1988) (determining constitutional-issue exception to forfeiture rule applies where constitutional issues were raised in the trial court and may be raised in a postconviction petition); *People v. Cregan*, 2014 IL 113600, ¶ 20 (applied constitutional-issue exception to noncapital cases).

¶ 15 Criminal prosecutions are required to comport with prevailing notions of fundamental fairness, including the meaningful opportunity for criminal defendants to present a complete defense. *California v. Trombetta*, 467 U.S. 479, 485 (1984). A trial court has an inherent authority to dismiss charges where its failure to do so would result in a deprivation of a defendant's due process rights. *People v. Newberry*, 166 Ill. 2d 310, 314 (1995) (citing *People v. Fassler*, 153 Ill. 2d 49, 58 (1992)). We review a trial court's denial of a motion to dismiss for an abuse of discretion. *People v. Mattis*, 367 Ill. App. 3d 432, 435 (2006).

¶ 16 Law enforcement's destruction of, or failure to preserve, " 'potentially useful evidence' " is not a due process violation where the defendant cannot demonstrate bad faith on the part of law enforcement. *People v. Hobley*, 159 Ill. 2d 272, 307 (1994) (quoting *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988) ("unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process")); *Illinois v. Fisher*, 540 U.S. 544, 549 (2004) ("the substance destroyed here was, at best, 'potentially useful' evidence, and therefore *Youngblood*'s bad-faith requirement applies").

¶ 17    Proper considerations for the trial court when determining whether due process was violated include the degree of bad faith or negligence by the State in destroying or failing to preserve the evidence and the importance of the lost evidence compared to the evidence at trial. *Hobley*, 159 Ill. 2d at 307. Bad faith "implies a furtive design, dishonesty or ill will." *People v. Danielly*, 274 Ill. App. 3d 358, 364 (1995). Factors to consider when examining the State's duty to preserve evidence include whether the State acted in good faith and per its normal practice and whether the evidence was significant in defendant's defense and was such that comparable evidence could not be obtained by other reasonable and available means. *Trombetta*, 467 U.S. at 488-89.

¶ 18    The trial court found there was no bad faith on the part of the officers in deleting or ordering the deletion of the recordings, and in failing to seize the cell phones under the circumstances. We find that, to the contrary, the actions of the officers were in bad faith and "implied furtive design, dishonesty or ill will." The witnesses were ordered to turn over their phones or delete the recordings, despite the officers' belief the witnesses had a right to record the arrest and the officers had the right to seize the cell phones. Winbigler testified the police had insufficient manpower to collect the phones. Bush stated that he did not get the witnesses' contact information because he was maintaining order. Accepting the officers' claim that they could not seize the cell phones due to insufficient manpower, that justification does not warrant their demand that witnesses delete the videos.

¶ 19    Tate, Corbin, Hogue, Morrison and Haymon testified that the officers told them they would go to jail if they did not stop recording and erase the recordings. Corbin stated she heard an officer tell Tate it was illegal to record them and Taylor stated that an officer deleted his recording, telling him he could not record the arrest and it was unlawful to record the police. Only Bush testified that he ordered the witnesses to either delete the recordings or turn their phones over as evidence. Moreover, while several witnesses testified that the crowd dispersed on the officers' directives, only two witnesses, Hague and Morrison, testified that they were ordered to leave on threat of arrest. Corbin also said that the crowd dispersed even though the police did not order people to leave. Haymon said she was told to move back or go to jail and that her car would be towed and she would be arrested for obstruction.

¶ 20    The officers' need to maintain control of the crowd did not necessitate their order to stop recording and delete the videos or go to jail. Knowing the recordings to be potentially useful, the officers could have asked the witnesses to bring their phones to the station at a later time. Bush admitted that he could have tried to identify the witnesses after the incident. The most likely reason the officers would have for requiring the witnesses to destroy the videos were if the videos captured improper conduct by law enforcement. As Bush testified, the recordings would have been material to Nunn's guilt as they would have captured Nunn's alleged offenses. Significantly, the videos would also have captured the conduct of the police during the arrest. Although both parties presented eyewitnesses to Nunn's arrest, the recordings would have portrayed the events as they occurred. No other evidence was comparable as the witness testimony was subject to each witness's perspective. There was no testimony regarding the police department's normal practice regarding the collection and preservation of evidence. However, it seems unlikely the normal practice would be to destroy admittedly relevant evidence.

¶ 21    The dissent concludes that Nunn failed to demonstrate the police acted in bad faith or that evidence was destroyed due to their actions. *Infra* ¶ 27. He claims that we are reweighing the

evidence and considering only the testimony of defense witnesses. *Infra* ¶ 28. There are two problems with the dissent's claims. First, in reaching our disposition, we do not dispute the findings of the trial court regarding the trial testimony. The trial court expressly found: (1) Winbigler and Bush knew people were recording the arrest but it was unclear when and at what point the recordings occurred; (2) Winbigler and Bush were aware the witnesses had the right to record the arrest; (3) the witnesses were told by the police to turn over their phones or delete the recordings; (4) the police acted in response to the "exigent" circumstances and were trying to maintain crowd control without seizing the phones; and (5) there was no dispute the recordings were potentially or had the probability of being relevant. Our analysis incorporates these findings and we use them in supporting our disposition.

¶ 22     The majority analysis relies on the testimony of the police officers as much or more as it does the testimony of the defense witnesses. Winbigler saw other officers try to take the witnesses' phones and heard the officers tell witnesses to stop recording and delete the recordings. Bush told the witnesses the same thing. The dissent rejects our assertion that the officers could have acted to preserve the evidence, asserting that we are foisting a "vast, and frankly unmanageable, burden of tracking down recordings of every incident" on police. *Infra* ¶ 34. We do not assign any such burden. Both Winbigler and Bush believed that the witnesses had the right to record the arrest. Bush testified the recordings would have been material to Nunn's guilt or innocence. It seems reasonable and not an onerous burden for the officers here to have collected the cell phones from the witnesses who were recording or at the very least ask them to bring their phones to the police station later. Instead, the officers made an intentional decision to stop or destroy the collection of evidence.

¶ 23     We find that the officers demonstrated bad faith in failing to preserve and in ordering the destruction of the recordings and that, as a result, Nunn was deprived of her due process right to a fair trial. Her motion to dismiss should have been granted and the trial court erred in denying it. Because our finding that Nunn's due process right to a fair trial was violated is dispositive, we do not address Nunn's claims of ineffective assistance of counsel and jury indoctrination.

¶ 24     For the foregoing reasons, the order of the circuit court of Knox County denying Nunn's motion to dismiss is reversed and her conviction is vacated.

¶ 25     Reversed and vacated.

¶ 26     JUSTICE SCHMIDT, dissenting.

¶ 27     The trial court did not err in denying defendant's motion to dismiss. There was conflicting witness testimony as to whether or not police deleted or forced bystanders to delete any video taken of the incident. Absent credible testimony that the officers actually engaged in such behavior, the majority's finding that the officers acted in bad faith is unsupported. I therefore dissent.

¶ 28     Generally, abuse of discretion is the appropriate standard for reviewing a trial court's ultimate ruling on a motion to dismiss. *People v. Campos*, 349 Ill. App. 3d 172, 175 (2004). However, where neither the facts nor the credibility of the witnesses is at issue, the issue presents a purely legal question, and the standard of review is *de novo*. *People v. Walker*, 308 Ill. App. 3d 435, 438 (1999). As the facts and credibility of the witnesses are unquestionably at

issue here, we review the trial court's decision for an abuse of discretion. I raise this issue only to point out that the majority reweighed the evidence, accepting all of the evidence in favor of defendant and rejecting the State's evidence.

¶ 29    Case in point: two of defendant's witnesses testified that they might have videos or photographs on their phones, but their phones were either broken or gone. Tate testified that she attempted to record the arrest, but the police told her that they would take her to jail if she did not put her phone away. Tate testified she was able to record three officers standing around defendant, who at the time was on the ground with one of the officer's knee in her back. Tate stated she did not offer the recording to the police. At the time of trial, Tate testified that her phone was broken, but she thought someone could "probably" get the video from it.

¶ 30    Corbin, on the other hand, testified that she saw Tate's phone "snatched" by an officer who told Tate, "You can't have that. You can't record. That's illegal."

¶ 31    Despite Corbin's testimony that Tate's phone was "snatched," Tate never testified that the police took her phone, or that she deleted the video per the officers' request. Tate did not hand her phone over to the officers. In fact, Tate testified that she thought the video could probably be retrieved from her broken phone. Defendant obviously knew of Tate as she called Tate as a witness. One would think that if there was anything whatsoever exculpatory on Tate's phone, it would have been retrieved and used. The obvious implication here, as I suspect the jury surmised, is that there was nothing on Tate's phone to aid defendant's version of the facts.

¶ 32    Defendant's other witnesses, Hogue, Morrison, and Haymon, also testified that the police told witnesses who were recording that they had to delete the recordings, leave the scene, or go to jail. They notably did *not* testify that they witnessed police taking people's phones and deleting videos. David Taylor was the only witness to testify that an officer took his phone and deleted video. According to Taylor, he also took still photographs of the incident but, at the time of trial, no longer owned the phone and did not have access to the photos. None of the officers on the scene testified to physically taking a bystander's phone. Taylor's version of events is uncorroborated by any other witness testimony. In short, the defense's witnesses raised some credibility issues.

¶ 33    Admittedly, had the officers seized a witness's phone and deleted the video, or had the witness deleted the video on the officer's instruction, the majority would be correct. As outlined by the witness testimony above, we are short of that mark by a long shot.

¶ 34    I also take issue with the majority's attempt to foist upon police the vast, and frankly unmanageable, burden of tracking down recordings of every incident in which they might be involved upon pain of being accused of depriving some defendant of due process. The majority opines, "[k]nowing the recordings to be potentially useful, the officers could have asked the witnesses to bring their phones to the station at a later time. Bush admitted that he could have tried to identify the witnesses after the incident." *Supra* ¶ 20.

¶ 35    First of all, the police could have done a lot of things. Not asking witnesses to bring their phones to the station at a later time does not constitute a denial of defendant's due process. The majority cites no case law for the proposition that the police have a duty to preserve evidence which they do not, and never did, possess. The United States Supreme Court has held to the contrary, finding that the police do not have "an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution." *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988); see also *People v. Newberry*, 166 Ill. 2d 310, 315 (1995). It is unclear what the majority expected the police to do. Were the

- 7 -

officers to seize every cell phone from every bystander present on the chance that one or two may have contained some material evidence? Not only is that an unnecessary and inefficient use of police resources, it sets a dangerous precedent in an age where the technology to record or take pictures is readily available to everyone. Most likely, illegal, too.

¶ 36   Secondly, whether or not Bush could have tried to identify witnesses after the incident is irrelevant. Bush stated he was focused on crowd control, as many people were present and the crowd was becoming unruly. The majority also stated that "[a]lthough both parties presented eyewitnesses to Nunn's arrest, the recordings would have portrayed the events as they occurred." *Supra* ¶ 20. Well, of course they would, assuming any such recordings videotaped the event from beginning to end. Again, the majority assumes that such recordings existed and that they were helpful to defendant. The fact that defendant located and brought these witnesses into court is an even stronger suggestion that defendant knew exactly what was on those videos, at least those that existed, and made a strategic decision not to bring them to court.

¶ 37   Finally, unlike the majority, I cannot accept that "[t]he most likely reason the officers would have for requiring the witnesses to destroy the videos were if the videos captured improper conduct by law enforcement." *Supra* ¶ 20. I have no idea what the reasons were. One of them could have been a misunderstanding of the eavesdropping statute. Officer McCone's testimony demonstrated some uncertainty on whether he had the right to seize witnesses' phones as evidence. He stated that "that law has changed several times in the last year or so. I'm not exactly up to date on the exact law." Another is that I suspect that some police officers do not like being photographed or videotaped any more than movie stars, public figures, or even judges for that matter. I am not suggesting that it is proper for police to destroy evidence or order another to do so. However, on the evidence presented in this case, the trial court was not bound to believe any evidence was destroyed by, or at the behest of, police.

¶ 38   To be clear, I do agree with the majority's statement that "[t]he officers' need to maintain control of the crowd did not necessitate their order to stop recording and delete the videos or go to jail." *Supra* ¶ 20. That is where my agreement with the majority begins and ends. The defendant failed to demonstrate that the police acted in bad faith, actually destroyed any evidence, or that anyone destroyed evidence upon police orders.

¶ 39   As I would affirm the trial court's denial of defendant's motion to dismiss, I will also briefly address the issues defendant raised regarding jury instructions and *voir dire*.

¶ 40   The defendant argues that she was denied her right to a fair trial by the improper indoctrination of prospective jurors during *voir dire*. Defendant concedes that she failed to raise the alleged violations during *voir dire* in a timely posttrial motion, but argues we should review this issue for plain error. However, prior to determining whether plain error occurred, we must first determine whether error occurred at all. *People v. Sykes*, 2012 IL App (4th) 111110, ¶ 31 (citing *People v. Lewis*, 234 Ill. 2d 32, 43 (2009)). Based on my review of the record, no error occurred.

¶ 41   Illinois Supreme Court Rule 431(a) (eff. July 1, 2012) provides that *voir dire* questions "shall not directly or indirectly concern matters of law or instructions." The hypotheticals posed by the State did not concern matters of law or instructions. Rather, they were designed to determine whether the potential jurors were able to distinguish quantity versus quality of evidence, and whether they would be able to convict based on circumstantial evidence. This is permissible under *People v. Rinehart*, 2012 IL 111719, ¶ 16 (holding that broad questions are

generally permissible; for example, the State may ask potential jurors whether they would be disinclined to convict a defendant based on circumstantial evidence).

¶ 42    Those cases cited by defendant, *People v. Boston*, 383 Ill. App. 3d 352 (2008), *People v. Bell*, 152 Ill. App. 3d 1007 (1987), and *People v. Mapp*, 283 Ill. App. 3d 979 (1996), are all distinguishable from the case at bar. Specifically, the prosecutor in those cases made references to actual factual details of the case and essentially asked the jury to prejudge those facts.

¶ 43    There was no error, and thus no plain error. Defendant has forfeited this issue.

¶ 44    Finally, defendant contends that her counsel was ineffective when he failed to request that the jury be given a missing evidence instruction. Defendant argues that such a missing evidence instruction was approved in *People v. Danielly*, 274 Ill. App. 3d 358, 368 (1995). In *Danielly*, the police returned to the victim of a sexual assault the ripped undergarments she was wearing on the night of the incident. *Id.* at 361. Defendant argued that the police's return of those items, and the victim's subsequent destruction of them, violated his due process rights to have access to evidence. *Id.* at 362-63. While the court rejected defendant's due process argument, it did note that a missing evidence instruction would be appropriate on remand. *Id.* at 368. That instruction stated:

> " 'If you find that the State has allowed to be destroyed or lost any evidence whose content or quality are in issue, you may infer that the true fact is against the State's interest.' " *Id.*

¶ 45    Defendant argues that in this case, "counsel should have requested such an instruction given the police-ordered destruction of the bystanders' video recordings."

¶ 46    Distinct from *Danielly*, and what the defendant and the majority ignore, is that the police never possessed any evidence. It is axiomatic that a missing evidence instruction is inappropriate if there was never any evidence to begin with. As for defendant's argument that the videos were ordered to be destroyed, no witnesses testified that they destroyed any of their recordings at the officers' behest. The only witness who testified that the police took his phone and physically deleted the recording is Taylor. The still photographs Taylor allegedly captured were not produced because Taylor testified he no longer had the phone. Well, had any video Taylor claims police deleted not been deleted, he would not have that either. Taylor could not recall whether or not he was high that evening, and no officer admitted to taking any witness's phone. Nonetheless, the majority accepts Taylor's testimony as fact. Even accepting Taylor's testimony as fact, we know that he did not have the phone at the time of trial. Had a video helpful to defendant been on the phone, it would, like the photographs, have been unavailable as evidence at trial.

¶ 47    In short, counsel was not ineffective for failing to request a missing evidence instruction absent credible evidence that the police prevented defendant from producing helpful evidence.